**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

MORGAN & MORGAN, P.A., et al.,

Plaintiffs,

v.

THE FLORIDA BAR, et al.,

Defendants.

No. 4:26-cv-405-RH-MAF

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS


Introduction .......... 2

Background .......... 6

A. Legal background .......... 6

B. Factual background .......... 12

Argument .......... 14

I. Morgan & Morgan is likely to prevail on its claim that Rule 4-7.15(c) unconstitutionally restricts its commercial speech. .......... 15

A. Florida has no legitimate interest in restricting "unduly manipulative" lawyer advertising. .......... 17

B. The Bar's own evidence disproves the rule's effectiveness. .......... 19

C. The rule is far more extensive than necessary to accomplish the state's claimed goal. .......... 23

D. The rule is poorly designed to protect consumers. .......... 28

II. Morgan & Morgan is also likely to prevail on its claim that the rule is unconstitutionally vague. .......... 30

III. The other preliminary injunction factors are easily satisfied. .......... 34

Conclusion .......... 34

## INTRODUCTION

For decades, Florida has stood alone among the states in imposing the most "restrictive measures to control attorney advertising." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1248 (11th Cir. 2010). In an attempt to limit the impact of the U.S. Supreme Court's decision in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), which held that lawyers have a First Amendment right to advertise, Florida adopted "extensive attorney advertising rules" aimed at restricting "a wide range of common advertising content, such as statements of quality, comparisons, background sounds, and other stock advertising techniques." *Harrell*, 608 F.3d at 1247-48. Courts have since struck down most of these content-based restrictions either as violations of the First Amendment or as unconstitutionally vague. *See, e.g.*, *Searcy v. Fla. Bar*, 140 F. Supp. 3d 1290, 1298 (N.D. Fla. 2015). One rule, however, has thus far managed to avoid judicial review: Florida Rule of Professional Conduct 4-7.15(c), which categorically prohibits any lawyer advertising containing "the voice or image of a celebrity."

This case challenges the constitutionality of that rule. As the Supreme Court has explained, "restraints that would be unacceptable as applied to commercial advertising generally are equally unacceptable as applied to [lawyer] advertising." *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 647-48 (1985). It would be unthinkable for a state to ban celebrities in any other kind of advertising—to prohibit, for example, Michael Jordan from appearing in Nike's ads or William Shatner from

promoting Priceline. Yet the Florida Bar imposes just such a restriction on lawyers and law firms in Florida. *See* Fla. Bar, Advert. Committee File No. 05-00256 (Beck Decl. Ex. 11) (prohibiting lawyer advertisement featuring William Shatner). It does so even though insurance companies, which commonly have interests adverse to Morgan & Morgan's clients, freely use celebrities in their advertising—including in State Farm ads featuring Jason Bateman and Nationwide ads featuring Peyton Manning—without any suggestion of harm.

The Bar justifies its rule on the ground that celebrities in television or radio advertising may "unduly manipulat[e]" consumers when they appear. But survey evidence from its own files shows the opposite: that "consumers do not attach such unquestioning trust to the words of celebrities." Rather, the use of celebrities—like the commonplace advertising techniques targeted by the Bar's other unconstitutional rules—benefits consumers by helping them find a lawyer to assert their legal rights. Most consumers have never hired a lawyer and are intimidated by the prospect of consulting one. Advertising methods like the use of celebrities to "attract[] the attention of the audience" allow lawyers to reach those who might otherwise never consider seeking legal help. *Zauderer*, 471 U.S. at 647.

Even if the Bar had evidence that celebrity advertisements are somehow harmful (and it doesn't), the rule adopts a definition of "celebrity" that is far too broad, extending not just to the television and radio ads that the Bar originally sought

to restrict, but also to "newspapers, magazines, brochures, … websites, social networking," and any other "print or electronic" medium. Fla. R. Prof'l Conduct 4-7.11(a). Further, the rule reaches well beyond the sorts of endorsements that the Bar thought problematic, prohibiting *any* use of a celebrity's voice or image even when the celebrity does not endorse or recommend anything. The Bar has thus informed Morgan & Morgan that it may not run its advertisements in Florida that feature celebrities in humorous vignettes—ads that the firm freely runs in other states and that say nothing with the potential to mislead consumers. At the same time, the rule seemingly *allows* lawyer ads to include express endorsements by celebrities—as long as they don't include the celebrity's voice or image. That makes no sense.

Worse, the rule extends to anyone who is "recognizable" to an ad's target audience even "on a regional or local level"—a definition that would include not just traditional celebrities, but also local politicians, lawyers, and business owners, among others. The rule thus subjects Morgan & Morgan to potential discipline, for example, for including an image of Barack Obama in its annual *Verdict* magazine. *See* Clem Decl. ¶ 15(d). It would likewise prohibit a commercial litigation firm from using images of business leaders like former Disney CEO Michael Eisner. *See*, *e.g.*, *Michael Eisner*, Williams Parker, https://perma.cc/YYS2-BUDB. And it would also bar a civil-rights firm from publishing the image of a prominent civil-rights leader who recommends a firm, or an endorsement by a well-known religious leader or gun-

rights activist of like-minded lawyers. These concerns are not just theoretical: The Bar applied the rule, for example, to prohibit the host of a YouTube channel devoted to veterans' issues (a "celebrity," according to the Bar) from telling his viewers the name of a firm that could "help with your VA claim."

The rule's chilling effect on speech is exacerbated by its vagueness. Because it never specifies *how* recognizable a "celebrity" must be, and because the precise degree of a person's recognizability is difficult or impossible to pin down, the rule's applicability in each case turns on a matter of opinion about which reasonable people may disagree. The Bar's enforcement history bears that out: Bar authorities apply the rule in ways that are fundamentally unpredictable, subjecting lawyers and law firms to arbitrary enforcement in violation of the Due Process Clause.

Morgan & Morgan brings this motion reluctantly. Before filing this case, it asked the Bar's Board of Governors to suspend enforcement of Rule 4-7.15(c) until the Board and the Florida Supreme Court could consider the firm's pending proposal to repeal it. Earlier this month, however, the Board met without acting on that request—leaving the firm to continue facing an indefinite period of constitutional injury with no sure end in sight. Because the plaintiffs are likely to prevail on their claims, and because there is no countervailing interest in enforcing a rule that is unconstitutional and serves no purpose, this Court should preliminarily enjoin enforcement of Rule 4-7.15(c) until it can decide the case on the merits.

# BACKGROUND

## A. Legal background

### 1. The U.S. Supreme Court in *Bates* recognizes lawyer advertising as protected commercial speech, ending a decades-long ban.

More than a century ago, the American Bar Association adopted the Canons of Professional Ethics as the first set of national ethical rules governing lawyers. Deeming lawyer advertising to be "unprofessional" and "intolerable," the canons prohibited it in nearly all forms. ABA Canons of Prof'l Ethics, Canon 27 (1908).[1] Although the ABA did not state its reasons for restricting advertising, it most likely adopted the restrictions to "limit entry into the profession and restrict trade" in response to growing competition in the early twentieth century. *See* ABA, *Lawyer Advertising at the Crossroads* 33 (1995). The rules' prohibitions on advertising answered the concern of bar leaders that the changing legal profession "was being reduced to a trade." Linda Sorenson Ewald, *Content Regulation of Lawyer Advertising: An Era of Change*, 3 Geo. J. Legal Ethics 429, 431 (1990).

Lawyer advertising remained largely prohibited in every state until 1977, when the U.S. Supreme Court in *Bates* declared Arizona's advertising restrictions

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this memorandum.

unconstitutional under the First Amendment. 433 U.S. 350. By that time, evidence was mounting that the advertising ban had left "a substantial portion of the public … ill-informed about its rights, fearful about going to an attorney, and ignorant concerning how to choose one." *In re Petition of Felmeister & Isaacs*, 518 A.2d 188, 192 (N.J. 1986).

In *Bates*, the Court recognized for the first time that non-misleading lawyer advertising is a form of protected commercial speech. *See Bates*, 433 U.S. at 383-84. The Court rejected Arizona's argument that such advertising would "tarnish the dignified public image of the profession," finding Arizona's "postulated connection between advertising and the erosion of true professionalism to be severely strained." *Id.* at 368. As the Court explained, "[b]ankers and engineers advertise, and yet these professions are not regarded as undignified." *Id.* at 369-70. To the contrary, citing evidence that "[t]he absence of advertising may be seen to reflect the profession's failure to reach out and serve the community," the Court noted that "the fact that [the legal profession] long has publicly eschewed advertising" had likely led to "public disillusionment" and "cynicism with regard to the profession." *Id.* at 370-71.

In part as a response to *Bates*, the ABA in 1983 adopted the Model Rules of Professional Conduct, a completely redrafted set of rules that "eschew[ed] all regulation of the content of advertising that [was] not false or misleading." *Zauderer*, 471 U.S. at 646 n.13. The Federal Trade Commission—the federal agency charged

with protecting consumers from misleading advertising and restraints of trade—encouraged states to follow the ABA's lead. The FTC wrote to state bars that common advertising techniques, including endorsements, "are not necessarily misleading and may be effective in attracting and retaining consumer interest in the advertiser's message." Ltr. from FTC to N.J. Supreme Court 5 (Nov. 9, 1987), https://perma.cc/M8UW-PHJ3.

### 2. Florida attempts to limit *Bates* by prohibiting common advertising techniques, including the use of celebrities.

Even as the ABA worked to loosen advertising restrictions in response to *Bates*, Florida took the opposite tack. Responding to the "proliferation of attorney advertising in the wake of [] *Bates*," Fla. Bar Advert. Task Force 2004, *Report & Recommendations*, A-1 (2005) (2004 Task Force Report) (Beck Decl. Ex. 5), the Florida Supreme Court began in 1990 to amend its advertising restrictions to "apply expansively to a wide range of common advertising content." *Harrell*, 608 F.3d at 1247-48. Among many other restrictions, Florida imposed new prohibitions on client testimonials; references to past results; statements that describe the quality of the lawyer's services; slogans and jingles; background sounds; and visual or verbal depictions considered to be "manipulative," such as those that "create suspense, or contain exaggerations" or appeals to the emotions. *Id.* at 1248.

Alone among the states, Florida also adopted a blanket prohibition on the use of the "voice or image" of a celebrity in lawyer ads. Rule 4-7.15(c). The Florida

Supreme Court adopted the first version of its celebrity restriction as part of a "complete overhaul" of the rules in 1990. Fla. Bar Joint Presidential Advert. Task Force, *Final Rep. & Recommendations* 3 (May 30, 1997) (1997 Task Force Report) (Beck Decl. Ex. 3). The amendments required television and radio advertisements to "be articulated by a single voice," which the rules specified could not be "that of a celebrity whose voice is recognizable to the public." *In re Pet. to Amend the Rules Regulating the Fla. Bar*, 571 So. 2d 451, 461 (1990).

In asking the Court to adopt the rule, the Florida Bar explained that the restriction was necessary given television's "unique power to induce viewers to respond immediately, without reflection." Br. of Florida Bar at 12, *In re Pet. to Amend the Rules Regulating the Fla. Bar*, No. 74987 (Jan. 22, 1990) (1990 Petition) (Beck Decl. Ex. 1). But the only evidence related to celebrities that the Bar collected—an opinion survey on public attitudes to lawyer advertising—found the opposite: that "consumers do not attach such unquestioning trust to the words of celebrities." Tom L. Lee, *Lawyer Advertising: Consumer Attitudes, Response Patterns and Motivation Factors* 156 (1985) (Beck Decl. Ex. 2).

Unsatisfied with the impact of its new advertising rules, the Bar convened a second task force in 1995 to recommend further amendments. *See* 1997 Task Force Report. The task force commissioned a consumer survey to gauge the public's attitude toward lawyer advertising in Florida. The survey did not ask consumers

anything about celebrities in advertising. Nevertheless, the task force recommended retaining the ban on celebrity ads, asserting without evidence that "[t]estimonials by celebrities carry the inherent risk that a potential client will be unduly influenced by the celebrity's fame or personality." *Id.* at 14.

In 2004, a third Bar task force recommended retaining the ban on celebrities. But it again provided no basis for that recommendation other than the unsupported views of committee members, who believed that "there is a tendency of the public to make decisions on the basis of a celebrity lending credibility" to the advertising lawyer. 2004 Task Force Report at A-14–A-15. One member objected to the ban on the ground that the task force relied on its members' "personal experiences and personal preconceived interests" instead of "empirical studies and expert objective opinion regarding how advertising is received by its intended audience." Comments of Bill Wagner at 5-6, *In re. Pet. to Amend. Rules Regulating the Fla. Bar*, No. 05-2194 (Jan. 13, 2006) (Beck Decl. Ex. 6). Another pointed out that the task force had identified "no record of complaints or bar grievances" and thus "no legal basis for restricting protected commercial speech." Comment & Notice of Objection at 1-2, *In re Amends. to Rules Regulating the Fla. Bar*, No. 05-2194 (Jan. 31, 2006) (Beck Decl. Ex. 7).

Notwithstanding that lack of evidence, the Florida Supreme Court adopted the Bar's proposal to retain the celebrity ban. *See In re Amends. to the Rules Regulating the Fla. Bar—Advert.*, 971 So. 2d 763, 783 (Fla. 2007). And a few years later, the Bar

recommended *expanding* the rule, then "applicable only to television and radio," to make it "applicable to *all* media"—including print and internet ads. Pet. at 37, *In re Pet. to Amend Rules Regulating the Fla. Bar*, No. 08-1890 (Oct. 7, 2008) (Beck Decl. Ex. 8) (emphasis added). The Bar explained the amendment as "recogni[zing] that other media now have similar capabilities as television and radio." *Id.* Once again, the Court adopted the Bar's proposal without evidence. *See In re Amends. to the Rules Regulating the Fla. Bar*, 24 So. 3d 63, 133 (Fla. 2009).

The Bar conducted yet another "survey on public attitudes about lawyer advertising" in 2011. Pet. at 10, *In re Amends. to Rules Regulating the Fla. Bar*, No. 11-1327 (July 5, 2011) (Beck Decl. Ex. 9). Far from supporting the rule, the survey found that consumers rate celebrity endorsements as "by far the *least* important consideration" in choosing a lawyer. Fla. Bar, *Survey of Public Attitude Toward Lawyer Advert.* 29, 31 (March 2011) (Beck Decl. Ex. 10) (emphasis added). Without providing any reasoning or evidence, however, the Bar recommended retaining its ban on the use of celebrities. And the Florida Supreme Court adopted the Bar's proposal for Rule 4-7.15(c), which remains in place today.

The amended rule replaced a former prohibition on "manipulative" advertisements, which a federal court had recently declared unconstitutional, with one on "*unduly* manipulative" ads. *In re Amends. to Rules Regulating the Fla. Bar—Subchapter 4-7, Lawyer Advert. Rules*, 108 So. 3d 609, 625 (Fla. 2013) (Rule 4-7.15) (emphasis

added). It specifies that an "advertisement is unduly manipulative" if, with limited exceptions, it "contains the voice or image of a celebrity." *Id.* at 625-26. Lawyers who violate the rule are subject to discipline, including public reprimand, suspension, or disbarment. Rules 3-4.2, 3-5.1.

## B. Factual background

Plaintiff Morgan & Morgan, P.A., is a law firm based in Orlando, Florida. Clem Decl. ¶ 1. The firm is nationally known for its humorous and irreverent advertising campaigns, many of which feature famous athletes or other celebrities. *Id.* ¶¶ 7-8, 12, 14-16. The firm advertises in a variety of media, including on television and radio, on billboards, in print, and on the firm's website. *Id.* ¶¶ 7.

Mr. Clem has submitted numerous advertisements on behalf of Morgan & Morgan to the Florida Bar for review, many of which the Bar found to violate Rule 4-7.15(c) because they included the voice or image of a celebrity. *Id.* ¶ 11. He submitted, for example, proposed advertising featuring former basketball player Shaquille O'Neal, former *Malcolm in the Middle* star and professional stock-car racing driver Frankie Muniz, and professional golfer John Daly, among others. *Id.* ¶¶ 13-14. When the firm has submitted these ads for approval, the Bar has responded by relying on Rule 4-7.15(c) in declining to approve the ads. *See id.* The Bar's responses each ended with a specific threat: Use of the ad "may result in disciplinary action." *Id.* ¶ 18.

These proposed ads do not include an endorsement of Morgan & Morgan by celebrities or any claim of fact that could potentially mislead consumers. *See id.* ¶¶ 13-14. Instead, they typically feature the celebrities in humorous vignettes. *See id.* ¶ 13. In the case of golfer John Daly, for example, the firm's ad submission depicts firm founder John Morgan enlisting Daly to play golf on his behalf. *Id.* ¶ 13(a). A voiceover states: "Having John Daly as your designated swinger? That's a power move. Hiring America's largest injury law firm for your injury? That's also a power move." Daly speaks only one word in the ad—"Fore!"—as he sends a golf ball ricocheting off a series of obstacles for a hole in one. The Bar informed the firm that the ad was impermissible because "[a] celebrity appears in the advertisement, in violation of Rule 4-7.15(c)." *Id.*

In another case, the Bar concluded that Morgan & Morgan's proposed billboard offering a free youth football camp violated Rule 4-7.15(c) because it included an image of Miami Hurricanes player Malachi Toney—even though the billboard attributed no statements to Toney of any kind. *Id.* ¶ 13(c).



Rule 4-7.15(c)'s effect on Morgan & Morgan extends well beyond the firm's use of sports figures in television and billboard advertising. It also restricts the firm's extensive use of celebrity voices and images on its website and online. *Id.* ¶ 16. Because these materials are viewable in every state (including Florida), the rule forces the firm either to refrain from publishing them altogether or to publish them under risk of discipline by the Florida Bar. *Id.* And the rule likewise extends to the firm's print advertising, including its annual *Verdict* magazine, which includes images of recognizable figures in every issue. *Id.* ¶ 15. The rule subjects the firm to potential discipline, for example, for publishing an image of Barack Obama with Orlando mayor Buddy Dyer, because both are "recognizable" to the target audience. *Id.* ¶ 15(d).

## ARGUMENT

To establish entitlement to a preliminary injunction, a plaintiff must show:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). Each of these requirements is satisfied here, where the Bar has failed even to articulate (much less prove) a legitimate purpose for banning a common advertising device that every other state allows.

## I. Morgan & Morgan is likely to prevail on its claim that Rule 4-7.15(c) unconstitutionally restricts its commercial speech.

As the U.S. Supreme Court has emphasized, commercial speech is critically important not only to speakers and recipients of speech, but to the functioning of a free-enterprise economy. *See Bates*, 433 U.S. at 364. That principle holds true for lawyer advertising as much as for advertising for other products and services. *See Zauderer*, 471 U.S. at 646-47. Indeed, the Supreme Court has recognized that lawyer advertising is "undoubtedly more valuable than many other forms of advertising" because it "tend[s] to acquaint persons with their legal rights who might otherwise be shut off from effective access to the legal system." *Id.* at 647-48.

Because lawyer advertising is protected commercial speech, a state may limit it only in response to evidence of a serious and intractable problem, and then only when the restriction is "a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). To meet that standard, the state must satisfy the three-part test set forth by the U.S. Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), by showing (1) that "the asserted governmental interest is substantial," (2) that the regulation "directly advances the governmental interest asserted," and (3) that the regulation "is not more extensive than is necessary to serve that interest." *Thompson*, 535 U.S. at 566. The Court has stressed that the state's burden is a "heavy" one, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996), requiring actual evidence, not just speculation and conjecture,

"that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

In prohibiting advertisements containing "the voice or image of a celebrity," the Florida Bar did not even attempt to satisfy that burden. The reason is obvious: Rule 4-7.15(c) was not adopted in response to a real-world harm. Rather, it is a holdover from an earlier set of Florida ethics rules that prohibited a range of common advertising devices for the express purpose of limiting the impact of the U.S. Supreme Court's decision in *Bates*. *See* 2004 Task Force Report at A-1–A-2 (citing the "proliferation of attorney advertising in the wake of [] *Bates*"); 1997 Task Force Report at 3, 9, 27-28 (responding to the "blatant commercialization of the profession" after *Bates*).

The Bar's desire to circumvent Supreme Court precedent is, of course, not a valid state interest. *See NAACP v. Button*, 371 U.S. 415, 439 (1963). And in the years since Florida adopted these restrictions, federal courts have accordingly struck down many as unconstitutional. *See Harrell v. Fla. Bar*, 915 F. Supp. 2d 1285, 1300-01 (M.D. Fla. 2011) (holding unconstitutional a rule limiting lawyer ads to "useful, factual information"); *id.* at 1299 ("manipulative" ads); *id.* at 1309-10 (background sounds); *id.* at 1308-09 (quality of the lawyer's services); *Searcy*, 140 F. Supp. 3d at 1298 (specialty or expertise); *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1301 (S.D. Fla. 2014) (past results). Until now, Rule 4-7.15(c) has avoided such judicial scrutiny. But, as with the Bar's other blanket

restrictions on common advertising techniques, its rule fails each prong of the *Central Hudson* test.

### A. Florida has no legitimate interest in restricting "unduly manipulative" lawyer advertising.

*Central Hudson*'s first prong requires the Bar both to identify a substantial interest that its rule is designed to protect and to *prove* that the harms it identifies are real. *Edenfield*, 507 U.S. at 767-68. "Unlike rational-basis review," the commercial-speech test "does not permit [the court] to supplant the precise interests put forward by the State with other suppositions." *Id.* at 768. The court thus must "identify with care the interests the State itself asserts." *Id.*

Here, the Bar has never claimed that Rule 4-7.15(c) prohibits false or misleading advertising. Such advertising is prohibited instead by Rule 4-7.13 ("Deceptive and Inherently Misleading Advertisements") and Rule 4-7.14 ("Potentially Misleading Advertisements"). By contrast, the celebrity ban is governed by Rule 4-7.15, which prohibits ads that are "unduly manipulative." The Bar set forth that rationale in its 1997 task-force report, asserting that "[t]estimonials by celebrities carry the inherent risk that a potential client will be unduly influenced by the celebrity's fame or personality." 1997 Task Force Report at 14.

The Bar, however, has no legitimate interest in protecting consumers from being "manipulated" by advertising. As the Eleventh Circuit has noted, "almost every television advertisement employs visual images or depictions that are designed

to influence, and thereby 'manipulate,' the viewer into following a particular course of action." *Harrell*, 608 F.3d at 1255. If an interest in preventing such manipulation were sufficient to prohibit advertising, it would justify prohibiting virtually *any* lawyer advertisement. Indeed, a federal court declared Florida's former rule against "manipulative" ads unconstitutionally vague for precisely that reason. *See Harrell*, 915 F. Supp. 2d at 1299.

That the rule was later limited to "*unduly* manipulative" ads does not save it. The rules do not define that phrase. Given that advertising "by definition aims to 'manipulate' … a consumer's decision-making," it is "implausible that such manipulation … could be 'undue,' at least in any way that attorneys could discern and regulators could measure." Jan L. Jacobowitz & Gayland O. Hethcoat II, *Endless Pursuit: Capturing Technology at the Intersection of the First Amendment and Attorney Advertising*, 17 J. Tech. L. & Pol'y 63, 79 (2012). Indeed, the Bar's broad application of the rule even to innocuous ads like those sponsoring a free youth football camp makes clear that it gives the word "undue" no independent meaning.

The Bar's concern about manipulation is not based on evidence, but on the "assumption that [consumers] are insufficiently sophisticated." *Pub. Citizen v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 223 (5th Cir. 2011). That is exactly the sort of "highly paternalistic approach" that the Supreme Court has repeatedly condemned as a basis for restricting truthful commercial speech. *Va. State Bd. of Pharmacy v. Va. Citizens*

*Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). The Court has "refus[ed] to credit" the "paternalistic assumption" that consumers of legal services "are no more discriminating than the audience for children's television." *Peel v. Att'y Registration and Disciplinary Comm'n*, 496 U.S. 91, 105 (1990) (plurality op.).

### B. The Bar's own evidence disproves the rule's effectiveness.

**1.** Even if the Bar's interest in preventing manipulative advertising were "substantial in the abstract," that "does not mean … that its blanket prohibition … serves them." *Edenfield*, 507 U.S. at 770. The Bar must do more than just articulate a valid interest—it must demonstrate that its chosen restrictions advance that interest "in a direct and effective manner." *Mason*, 208 F.3d at 956.

The Bar cannot satisfy that test here. Despite sponsoring multiple task-force reports and consumer surveys, it has yet to identify evidence—in the form of consumer complaints, disciplinary records, surveys, studies, or empirical research of any kind—that the voice or image of a celebrity has misled or manipulated even a single consumer. That absence of evidence alone establishes the rule's unconstitutionality. *See id.* at 957-58.

Rather than supporting its view that the public is unduly swayed by celebrity advertising, the evidence accumulated by the Bar shows the *opposite*: that "consumers do not attach such unquestioning trust to the words of celebrities." Lee, *Lawyer Advertising: Consumer Attitudes, Response Patterns and Motivation Factors*, at 156. To the

contrary, the Bar's survey evidence shows that consumers rate celebrity endorsements as "by far the *least* important consideration" in choosing a lawyer. Fla. Bar, *Survey of Public Attitudes Toward Lawyer Advert.*, at 29, 31 (emphasis added). Survey respondents "uniformly affirmed the view that celebrities are only *paid performers*" whose inclusion in advertising "elicits suspicion rather than trust." *Id.*

Nor can the Bar rely on the experience of other jurisdictions to support its rule. Among the states, only Florida imposes a total prohibition on the appearance of celebrities in lawyer advertising. The ABA's model rules and the rules of every other state allow lawyers to advertise using the voices or images of celebrities—as did Florida's own rules before 1990—without evidence of harm to the public.

Other than Florida, only Pennsylvania currently singles out celebrities in lawyer advertising for special treatment. *See* Pa. R. Prof'l Conduct 7.2(e). Like Rule 4-7.15(c), Pennsylvania's rule has never faced a constitutional challenge. In other states that have adopted some form of celebrity ban, however, federal courts have held the rules unconstitutional for lack of supporting evidence. *See Pub. Citizen, Inc. v. La. Att'y Disciplinary Bd.*, 642 F. Supp. 2d 539, 545 (E.D. La. 2009) (striking down a Louisiana rule requiring burdensome disclosures in celebrity ads for "lack of evidentiary support"); *Alexander v. Cahill*, 598 F.3d 79, 95 (2d Cir. 2010) (New York rule limiting endorsements); *Schwartz v. Welch*, 890 F. Supp. 565, 575 (S.D. Miss. 1995) (Mississippi ban on celebrity voices). And Pennsylvania's rule is significantly

narrower than Florida's: It prohibits only "endorsement[s]" by celebrities. Pa. R. Prof'l Conduct 7.2(e). That leaves Florida as the only state in the nation to prohibit *any* use of a celebrity's voice or image, including in the sorts of harmless vignettes that are typical of Morgan & Morgan's ads.

**2.** In the face of this evidence, the only support the Bar has for its rule is its unsupported conclusion, set forth in its task-force reports, that consumers will "make decisions on the basis of a celebrity lending credibility" to the advertising lawyer. 2004 Task Force Report at A-14–A-15. Even if it weren't contradicted by evidence, however, the "unsupported conjecture" of Bar task-force members would not be enough to justify a restriction on commercial speech. *Mason*, 208 F.3d at 957-58. The Supreme Court has never "accepted 'common sense' alone to prove the existence of a concrete, non-speculative harm." *Id.* at 957.

Regardless, the Bar's explanation for the rule doesn't even have common sense behind it. As the Bar's own evidence attests, consumers have become accustomed to ads featuring celebrity endorsements for all manner of products and services—making it unlikely that they will be unduly swayed by such advertising. Lee, *Lawyer Advertising: Consumer Attitudes, Response Patterns and Motivation Factors*, at 156 (noting that consumers have been "overexpose[d]" to celebrity ads). For example, insurance companies (which commonly have interests adverse to Morgan &

Morgan's clients) commonly include celebrities in their ads, without evidence of harm to consumers.

Considering celebrities' "prevalence … in advertising and entertainment," nobody could "seriously believe—purely as a matter of 'common sense'—that ordinary individuals are likely to be misled" by this common advertising device. *Alexander*, 598 F.3d at 94. As the FTC has explained, such ubiquitous advertising techniques "are unlikely to hoodwink unsuspecting consumers because consumers are thoroughly familiar with them." *Submission of the Staff of the FTC to the ABA Comm'n on Advert.*, FTC 13 (June 24, 1994), https://perma.cc/2YD3-CFCA. The agency has cautioned against rules prohibiting "common methods that advertising firms have used for generations to make their messages memorable." *Id.* Restrictions on lawyer advertising, it explained, should "depend on what it says and how it is understood, not on whether it is catchy and effective." *Id.*

**3.** Even assuming the Bar could prove that consumers are influenced by television ads featuring a celebrity's voice or image, it could not establish that those consumers are harmed as a result. The Bar's justification for Rule 4-7.15(c) depends on its "highly paternalistic," *Va. State Bd. of Pharmacy*, 425 U.S. at 770, assumption that celebrity voices and images will cause consumers to reflexively hire a lawyer without considering qualifications or experience. But hiring a lawyer is different from buying a car or a tube of toothpaste. As the Supreme Court has observed, consumers are

less likely to make hiring decisions based on lawyer ads alone than they are for such ordinary consumer goods and services. *See Zauderer*, 471 U.S. at 646-47.

Again, the Bar's own survey evidence makes this clear. That evidence shows that consumers respond to lawyer ads by calling "to get more information" or to "set an appointment." Frank N. Magid Associates, *Attitudes and Impressions of Attorney Advertising: A Summary of Focus Group Results* at 4, 8-9 (Jan. 1997) (Beck Decl. Ex. 4). But they are consistently "clear that calling and hiring an attorney are different and separate decisions." *Id.* "Everyone" participating in the Bar's advertising focus groups said that "their interaction with a particular [lawyer] would go a long way toward making the final decision to retain legal counsel," but "no one sa[id] they would simply hire an attorney based solely on a television ad." *Id.*

And because Morgan & Morgan—like most plaintiff-side firms—charges nothing for a consultation, Clem Decl. ¶ 4, the worst-case scenario for these hypothetical irrational consumers is that they receive free advice from a lawyer who may "acquaint [them] with their legal rights," *Zauderer*, 471 U.S. at 646-48. Preventing that result cannot be a state interest strong enough to justify restraints on protected speech.

### C. The rule is far more extensive than necessary to accomplish the state's claimed goal.

**1.** Rule 4-7.15(c)—at a minimum—fails the final prong of the *Central Hudson* test because it is "broader than reasonably necessary to prevent" the targeted harm. *In re*

*RMJ*, 455 U.S. 191, 203 (1982). As the Bar's advertising committee has recognized, the "purpose of the rule is to prohibit a lawyer from being hired because of a celebrity endorsement"—that is, the rule targets ads that lend the celebrity's credibility to the advertising lawyer. Gary Blankenship, *Committee Addresses YouTube Lawyer Ad Issues*, Fla. Bar News (Aug. 19, 2021), https://perma.cc/VRQ7-TBSY; *see* Advert. Committee File No. 21-03006 (Beck Decl. Ex. 11). As written and applied, however, the rule isn't so limited; it covers *any* use of a celebrity's "voice or image"—regardless of whether the celebrity endorses or recommends the advertising lawyer.

That is precisely the sort of "blanket" prohibition on speech that the Supreme Court has repeatedly condemned. *Zauderer*, 471 U.S. at 648. The Bar has never cited "evidence or authority of any kind for its contention that the potential abuses" it claims "cannot be combated by any means short of a blanket ban." *Id.* Nor could it. Even if there were evidence that *some* celebrity ads unduly influence consumers (and there is not), many others are inarguably harmless. *See Alexander*, 598 F.3d at 94-95 (holding advertising rules unconstitutional because they prohibited potentially misleading advertising devices "even when they are not actually misleading"). Celebrities in Morgan & Morgan ads typically appear in comedic sketches that are incapable of misleading anyone. Clem Decl. ¶ 13. And the Bar has applied the rule even to the firm's billboard offering a free youth football camp. *Id.* ¶ 13(c). In none of

these ads is there even arguable consumer harm, yet the Bar found that Rule 4-7.15(c) prohibits them anyway.

**2.** The rule's definition of "celebrity" is also far broader than necessary to accomplish the Bar's claimed objectives—covering anyone whose voice or image is "recognizable" to an ad's "target audience" on a "national," "regional," or even "local level." Rule 4-7.15(c), cmt. On its face, that definition pulls in not just traditional "celebrities," but also local political, civil-rights, and business leaders, among others. The Bar found, for example, that "real estate investment coaches and mentors" were "celebrities" under the rule, because the target audience—participants in a real-estate webinar—would have recognized them. Advert. Committee File No. 41770 (Beck Decl. Ex. 11). And it found that the host of a YouTube channel devoted to veterans' issues was a "celebrity" because the host was recognizable to the "specific audience" of those watching the channel—concluding, as a result, that Rule 4-7.15(c) barred the host from recommending to viewers a firm that could "help with your VA claim." Blankenship, *Committee Addresses YouTube Lawyer Ad Issues*; *see* Advert. Committee File No. 21-03006 (Beck Decl. Ex. 11); *see also* Clem Decl. ¶ 14(c) (finding podcasters to be celebrities because they are recognizable to their own audience).

The Bar has never asserted any interest in applying the rule so broadly. Its whole rationale for restricting celebrity ads is that "a potential client will be unduly

influenced by the celebrity's fame or personality." 1997 Task Force Report at 14. It has never suggested—much less proved—that an ordinary webinar host, YouTube channel, or podcast is likely to have that effect.

**3.** The Bar likewise lacks any rationale for extending its prohibition to all forms of advertising media. It justified its original celebrity rule based on the "unique power" of television "to induce viewers to respond immediately, without reflection." 1990 Petition at 12. But without articulating any reason for doing so, it later expanded the rule to cover "*all* forms of communication in any print or electronic forum"—including "newspapers, magazines, brochures, flyers, … websites, social networking," or any other "print or electronic" medium. *In re Amends. to Rules Regulating the Fla. Bar—Subchapter 4-7, Lawyer Advert. Rules*, 108 So. 3d at 616 (Rule 4-7.11(a)) (emphasis added).

The Bar has never attempted to articulate a state interest that would justify such a massive expansion of the rule's scope. Even assuming the Bar had evidence that celebrities on television and radio pose some risk to consumers (and it has none), that would not justify the decision "to lump all methods of lawyer communication together." *Id.* at 611-12, 615 (Pariente, J., dissenting) (objecting to the rules' "one-size-fits-all approach"). When assessing restrictions on lawyer advertising, "the mode of communication makes all the difference." *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 475 (1988). Thus, a federal court declared Louisiana's advertising rules unconstitutional

as applied to lawyer websites because the state "simply applied the same Rules as those developed for television … to Internet advertising," even though such advertising "differs significantly from advertising in traditional media." *Pub. Citizen*, 642 F. Supp. 2d at 558-59. The same is true here.

**4.** Even when a state's interest is compelling, "if the Government [can] achieve its interests in a manner that does not restrict speech, or that restricts less speech, [it] must do so." *Thompson*, 535 U.S. at 371. There is an obvious alternative to the Bar's blanket prohibition here: to require disclosures or disclaimers in cases where a lawyer's use of a celebrity has the potential to mislead. *See RMJ*, 455 U.S. at 203 ("States may not place an absolute prohibition on certain types of potentially misleading information … if the information may be presented in a way that is not deceptive.").

That's the approach followed by the FTC. The agency allows celebrity endorsements in all forms of advertising as long as the celebrities disclose their financial interest in contexts (such as press interviews) where that fact would be relevant but not obvious to consumers. *See Guides Concerning the Use of Endorsements and Testimonials in Advertising*, 88 Fed. Reg. 48092-01 (July 26, 2023). Such concerns, however, are not implicated by typical commercial advertising—like Morgan & Morgan's television and billboard ads—for which consumers understand that a celebrity will "be reasonably compensated." *Id.* at 48111. And the FTC has long

opposed state efforts to impose more sweeping restrictions, explaining that "requiring disclosure rather than prohibiting such endorsements protects consumers while encouraging the truthful flow of information." *See* Letter from FTC Staff to Michael Colodner (Sept. 14, 2006), https://perma.cc/74ZU-ZWFJ.

Other states have adopted similar rules requiring disclosure of paid endorsements. *See*, *e.g.*, La. R. Prof'l Conduct 7.2(c)(1)(H); R.I. R. Prof'l Conduct 7.1(b). "Nothing in the record suggests that such disclaimers would have been ineffective" here. *Alexander*, 598 F.3d at 96.

### D. The rule is poorly designed to protect consumers.

Taken together, *Central Hudson*'s second and third prongs require the state to show a "fit between [its] ends and the means chosen to accomplish those ends." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995). The Bar cannot make that showing here. Even as Rule 4-7.15(c) prohibits celebrity ads that contain no endorsement of the advertising lawyer, it seemingly permits ads containing *express* celebrity endorsements—provided that the celebrity's "voice or image" is not included. For a rule purportedly designed to prevent celebrities from lending credibility to a lawyer's advertisements, that makes no sense.

Rule 4-7.15(c)'s exceptions also cannot be squared with its purpose. The rule exempts ads featuring a "local announcer, disc jockey, or radio personality." Those roles easily meet the definition of "celebrity," as the Bar itself previously recognized,

because their voices are "recognizable to the intended audience." *See* Advert. Committee File No. 91-05608 (Beck Decl. Ex. 11). But the Bar has identified no reason to believe that these specific types of celebrities, alone, are less likely to manipulate the public.

Further, the rule illogically regulates use of an "authority figure such as a judge or law enforcement officer" less restrictively than it does a celebrity. Any concern about perceived improper influence attributable to a celebrity would apply at least equally to such an authority figure. Yet Rule 4-7.15 permits them to appear in lawyer advertising as long as they don't "endorse or recommend the lawyer or act as a spokesperson"—while prohibiting celebrities from doing the same. *See Rubin*, 514 U.S. at 489 (holding that "exemptions and inconsistencies" in a challenged regulation "bring into question the [regulation's] purpose"). The "overall irrationality" of Florida's rule means that it cannot survive the *Central Hudson* test. *Id.* at 488.

* * *

The Bar, in short, has no legitimate interest in prohibiting celebrity voices and images in lawyer advertising, and its advertising rules do not directly advance—and are far more extensive than necessary to serve—any interest it might assert. Morgan & Morgan is thus likely to succeed on its claim that Rule 4-7.15(c) infringes its First Amendment rights.

## II. Morgan & Morgan is also likely to prevail on its claim that the rule is unconstitutionally vague.

It is a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017). And where a law "threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech," the Constitution demands a particularly "high level of clarity." *Konikov v. Orange County*, 410 F.3d 1317, 1329 (11th Cir. 2005). A law is unconstitutionally vague when it is "so unclear as to what conduct is [prohibited] that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Mason*, 208 F.3d at 958. Rule 4-7.15(c) fails that test. Its requirements are "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits" and Bar authorities "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Wollschlaeger*, 848 F.3d at 1320.

As noted above, the rule adopts an extraordinarily broad definition of "celebrity," pulling in local political, civil-rights, and business leaders, among others. But while giving the Bar discretion to prohibit any advertisement containing a "recognizable" person, the rule nowhere defines the term "recognizable." *See id.* at 1319-20 (holding a law prohibiting "unnecessarily harassing" behavior unconstitutionally vague, where a definition of that phrase was "markedly absent"). Nor does it provide any "meaningful standards" on which lawyers and Bar

authorities can rely to predict whether a particular person is sufficiently "recognizable" to meet the definition of "celebrity" under the rule. *Harrell*, 608 F.3d at 1255; *see Johnson v. United States*, 576 U.S. 591, 598 (2015) (holding the phrase "serious potential risk" unconstitutionally vague where the statute failed to specify "how much risk"); *Wollschlaeger*, 848 F.3d at 1321 (holding anti-harassment statute unconstitutional where it failed to specify "the level of harassment" required). Does the rule require recognition by all (or almost all) of the target audience? A majority? A significant percentage? Or is it enough if the person is recognizable to just one or a few members of the audience? The rule doesn't say.

Without a fixed rule, nothing prevents these questions "from devolving into guesswork and intuition." *Johnson*, 576 U.S. at 600. And the Bar has made no effort to provide guidance that might limit the rule's ambiguity. There are no standards, explanations, or examples set forth in the rule or its comment, the Bar's *Handbook on Lawyer Advertising and Solicitation*, or its other published materials. Nor has the Florida Supreme Court ever explained the rule's meaning. And because no other state has adopted a comparable rule, there are no decisions in other states that might shed light on the rule.

Even if the rule provided a measurable standard, lawyers would have no way of knowing whether that standard is met in a particular case. There will, of course, be obvious cases (like Morgan & Morgan ads including images of Shaquille O'Neal

or Mike Tyson). But the rule's extraordinarily broad definition of "celebrity" means that recognizability (especially at the "regional" or "local" level) will often be difficult or impossible to pin down—at least without resort to infeasibly expensive public-opinion surveys, studies, or expert help. A rule that requires a costly investigation in each case does not enable "people of ordinary intelligence to understand what conduct it prohibits." *Wollschlaeger*, 848 F.3d at 1319-20. And even if a lawyer did conduct such an investigation, nothing prevents Bar officials from disagreeing with the results based on their own subjective view of a person's recognizability. The rule thus "combine[s] indeterminacy" over "how much" recognizability is required with "indeterminacy about how to measure" that recognizability, *Johnson*, 576 U.S. at 598, leaving unchecked discretion in the hands of Bar officials and making it impossible for lawyers to predict how the rule applies in a particular case.

The impossibility of consistently applying the rule is demonstrated by the arbitrariness of the rule's application. For example, the Bar staff member charged with initially reviewing a proposed ad featuring former Major League Baseball player Jody Reed concluded that Reed was a "celebrity" under the rule. *See* Advert. Committee File No. 15-01082 (Beck Decl. Ex. 11). But the Bar's Standing Committee on Advertising reversed, finding that—because Reed "ended his professional baseball career in 1997"—he "was not readily recognizable by his on-screen image alone" when the ad aired in 2015. *Id.* The committee did not reference any survey or

other evidence from which it could have reached that conclusion. Instead, its decision appears to turn on whether Reed was recognizable to the Bar officials reviewing the ad.

The committee likewise disagreed with its own staff on Morgan & Morgan's ad featuring former NBA player Chandler Parsons, finding that Parsons was not recognizable to the ad's intended audience. *See id.* No. 22-1791; *see also, e.g.*, No. 12-00614 (reversing Bar staff's conclusion that a former professional football player was recognizable). By contrast, the committee reached the opposite conclusion on Morgan & Morgan's billboard featuring freshman Miami Hurricanes player Malachi Toney, deciding that he was already sufficiently "recognizable" under the rule in his first year of college football. *See id.* No. 26-03030. It did the same in reversing Bar staff's finding that prominent internet personality Mike Busey was a celebrity under Rule 4-7.15(c). *See id.* No. 23-01034; *see also*, *e.g.*, *id.* No. 05-00256 (finding that actor Robert Vaughn was "a celebrity who is recognizable to the public," but that actor Brian Carney was not).

In none of these decisions did the Bar cite any evidence or reasoning in support of its findings—leaving lawyers to guess at the criteria it uses to determine recognizability. That "evidence of arbitrary … enforcement" is an independent reason why the rule is unconstitutionally vague. *Harrell*, 608 F.3d at 1255.

## III. The other preliminary injunction factors are easily satisfied.

In any case where a plaintiff can show likelihood of success on its claim that its First Amendment rights were violated, the remaining three factors of the preliminary injunction test are almost always satisfied. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor*, 458 F.3d at 1271-72. And that impact on fundamental rights cannot be outweighed by the interests of the state or the public, neither of which has a legitimate interest in enforcement of an unconstitutional rule. *See id.*

The Bar's failure to articulate any legitimate purpose for Rule 4-7.15(c) tilts these factors particularly heavily in Morgan & Morgan's favor here. As explained, all the available evidence shows that celebrity voices and images are harmless to the public. Because the rule does not serve any consumer-protection function or other legitimate interest, no harm can come from allowing Morgan & Morgan to run the same advertising in Florida that it already runs in other states—at least until this Court can reach a final decision on the merits.

## CONCLUSION

This Court should grant a preliminary injunction against enforcement of Florida Rule of Professional Conduct Rule 4-7.15(c), which prohibits lawyers from engaging in advertising that contains "the voice or image of a celebrity."

October 28, 2026

Respectfully submitted,

*/s/ Gregory A. Beck*
GREGORY A. BECK
Bar No. 494479DC
DEEPAK GUPTA
Bar No. 495451DC
JONATHAN E. TAYLOR
**pro hac vice*
GUPTA WESSLER LLP
1400 16th Street NW
Washington, DC 20036
(202) 888-1741
*greg@guptawessler.com*

*Counsel for Plaintiffs*

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(B), the plaintiffs' counsel conferred by email and phone on September 18, 2026, and on other occasions to discuss this motion, but were unable to resolve the issues contained herein.

*/s/ Gregory A. Beck*
Gregory A. Beck

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the type-volume limitation of Local Rule 7.1 because this memorandum contains 7,973 words. This brief complies with the typeface requirements of Local Rule 5.1 and the type-style requirements of Rule 5.1 because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Gregory A. Beck*
Gregory A. Beck